MARC E. JOHNSON, Judge.
|aThe employer, Louisiana Machinery Company, L.L.C. (hereinafter referred to as “LM”), and its workers’ compensation insurer, Travelers Property Casualty Company of America (hereinafter referred to as “Travelers”), appeal from the decision of the workers’ compensation court that reinstated indemnity and medical benefits to claimant, Dewayne Morris. Claimant Morris answers the appeal and alleges the workers’ compensation court erred in failing to award penalties and attorney fees for arbitrary and capricious failure to pay. Morris also seeks additional attorney fees alleging that this appeal is frivolous. For the reasons that follow, we affirm the decision of the workers’ compensation court. In addition, we find Morris’s answer to be meritless.
FACTS AND PROCEDURAL HISTORY
The facts adduced at the trial of this matter are as follows: Claimant Morris worked for LM on a fourteen day on/fourteen day off rotation. His first day of employment was September 19, 2008. On day nine of his first rotation, Morris fell from an excavator approximately four feet and landed on the concrete floor, after | flipping on a rubber mat that had been rolled up and placed on the track of the excavator the previous evening. As a result of the fall, Morris injured his knee.
Travelers paid benefits from October 4, 2008 to November 13, 2008 and from January 28, 2009 to December 1, 2009. Thereafter, Travelers terminated Morris’s benefits. On December 23, 2009, Morris filed this suit.
In this proceeding, Morris alleged that he suffered a knee injury as a result of the fall. Morris further alleged that his knee was not adequately treated and, therefore, became unstable. Approximately one year later, Morris fell and suffered a back injury. He contends that his fall and subsequent back injury were caused by his unstable knee and therefore this injury was also related to his work related accident in September of 2008.
Relative to his knee injury, Morris was transported to and treated at the local emergency room on the day of the accident. An x-ray showed no bony abnormalities. It was recommended that he seek a follow-up appointment with an orthopedist. Because he was a Mississippi resident, Morris began treatment with Dr. Martin in Mississippi.[1] Morris’s first visit to Dr. Martin was on September 30, 2008. Dr. Martin reviewed his x-ray and ordered an MRI. Dr. Martin recommended a knee immobilizer and advised that Morris should remain out of work. The results of the MRI were inconclusive but indicated the possibility of a ligament strain or tear. Morris chose to receive conservative treatment and was ordered to use crutches and a knee brace. On Morris’s October 10th *1177 visit, Dr. Martin reassigned the knee immobilizer and crutches. Morris was released to light duty, seated work only.
On his October 28, 2008 visit, Morris stated that he wanted to get back to work. Dr. Martin prescribed a knee brace with hinges. Morris returned to work on ^November 5, 2008. He was squatting and taking bolts out of a piece of machinery, when his knee locked up. Morris testified that he kept working, and he was “taking it as easy” as he could. Dr. Martin prescribed continued use of the knee brace at Morris’s December 2nd visit and recommended that Morris increase his activity.
In early January, Morris was transferred to Morgan City. The work involved boats and working in tight areas with a lot of bending, stooping and squatting. Morris testified that he was unable to do the movements required. Morris testified that his last day at work was January 21, 2009.
Morris’s next appointment with Dr. Martin was on January 23, 2009. At that visit, Morris reported that he had pain upon squatting and knee pops. Dr. Martin told him that these symptoms were consistent with a medial meniscus tear, and he recommended that Morris undergo arthroscopic surgery.
Dr. Martin performed Morris’s knee surgery on February 2, 2009, and Morris began physical therapy. Morris stated that, at the end of February, he was still having issues with his knee giving way and random pain. Morris testified that on his February 26th visit to Dr. Martin, he requested that another MRI be done; however, his request was not approved.[2]
Morris’s next doctor visit was on March 26, 2009. He indicated that he was still in pain. Physical therapy was continued. Dr. Martin released Morris to modified, sedentary work duty. In his April 16, 2009 visit, Dr. Martin noted that Morris had continued complaints of left knee pain. Dr. Martin also noted in his records that one of his staff members had observed an advertisement for grass mowing services, giving Morris’s name and telephone number.
IfiDr. Martin also sent Morris for a Functional Capacity Examination (FCE). After receiving the results of the FCE on May 8, 2009, Dr. Martin noted in his record that the results of the FCE indicated light level work, and Morris exhibited self-limiting behavior. Dr. Martin maintained his work release recommendation of modified duty. Dr. Martin also expressed that he felt that Morris had reached maximum medical improvement.
Morris testified that once he received the results of the FCE stating that he was capable of light level work, he contacted LM. LM told him, however, that he needed to be able to perform full duty in order to return to work. In July of 2009, Morris received a termination letter from LM due to six months of continuous disability.
On June 29, 2009, Travelers sent Morris to Dr. Thomas Blake, an orthopedist, for an Independent Medical Exam (IME). Dr. Blake opined that Morris had either a second meniscus tear or an incomplete resection of the initial tear, and he recommended that a second MRI be performed. Dr. Blake also concluded that the medical documentation supported a causal relationship between the accident and the injury. Dr. Blake did not give the results of his evaluation to Morris. In addition, Travel *1178 ers did not give its approval for the second MRI.
In July of 2009, Travelers spoke with Dr. Martin, and requested that he explain the results of the IME to Morris. According to Dr. Martin’s notes, he told Travelers that he did not feel comfortable giving Morris the results, and he did not inform Morris that a second MRI was recommended by Dr. Blake. Dr. Martin did recommend that Morris be sent for a second opinion. At trial, Morris confirmed that he was not informed of the results of Dr. Blake’s examination by either Dr. Blake or Dr. Martin, nor was he informed by Travelers.
| (¡Morris’s last visit to Dr. Martin was in September of 2009. At the time, Dr. Martin gave him a cortisone shot in his knee and ordered more physical therapy. Dr. Martin did not recommend a second MRI; however, he again stated in his notes that Morris should get a second opinion.
At some point after Dr. Martin’s discovery of the advertisement for lawn mowing services, Travelers set up surveillance of Morris. Several tapes were recorded showing Morris walking and setting up a fruit stand, carrying watermelons, and riding a lawn mower. Travelers sent copies of portions of the surveillance tapes to Dr. Martin. In August of 2009, Dr. Martin informed Travelers that he believed that Morris was trying to manipulate the system.
Relative to his back injury, on November 11, 2009, Morris was walking in his back yard when his knee gave out, causing him to fall down an embankment. Morris testified that he spent a couple of days in pain and then went to the emergency room at University Medical Hospital in Jackson, Mississippi. He was given an x-ray and a CT scan. The doctor opined that Morris possibly had a herniated disc (disc extrusion). The doctor prescribed pain medication and physical therapy. A second MRI on March 10, 2010 showed disc degeneration, spurring and disc extrusions at L-2 through S-l. A nerve conduction study was performed on May 4, .2010 and yielded normal results. An EMG on May 11, 2010 was likewise normal. It was recommended that Morris follow-up for his knee and then return for future treatment after resolution of his knee problems.
Morris testified he was seen by Dr. Craft, a sports orthopedist, to follow up with his knee problem. An MRI of his knee on June 8, 2010 suggested a meniscus tear. On August 27, 2010, Dr. Craft performed a second surgery. After physical therapy, Morris testified he had no more pain and no more falls. Physical therapy notes after the surgery reflected that Morris told thé therapist that his knee pain had |7resolved. In his deposition, Dr. Craft stated that the meniscus tear was the cause of his knee problems and was most likely related to the initial injury.
Trial was held on January 6, 7, 10 and 11 of 2011. At trial, Morris stated that he had an appointment in February with Dr. Walker, a spine specialist. At the time of trial, he no longer had problems with his knee, but he continued to experience back pain. Testimony at trial was adduced to show that in 2007, several years prior to his start of employment with LM, Morris had started both a lawn service and a fruit stand to sell extra produce that he grew. He participated in these businesses with his two sons, who were teenagers at the time. Morris and his sons testified that when he obtained the job with LM, the sons took over both businesses, performing the required jobs in their entirety. It was also attested that the sons received the monies earned from those jobs.
On cross-examination, Morris was questioned extensively about the lawn mowing *1179 and vegetable stand businesses. He and his sons testified that although the monies were paid by checks written out to him or his wife, they were earned by and went to the needs of his sons. LM called attention to the fact that the lawn business was in his name and listed his phone number, The sons explained that it was easier to keep the business that way, since they were in school and could not answer the phone during the day.
When asked if he had committed fraud to collect workers’ compensation, Morris responded that his primary goal has always been to get back to work, and that he does not receive enough from wage benefits to pay his bills.
Alberta Gardner was the insurance adjuster for Travelers who handled Morris’s case. She testified that there was no dispute that the accident occurred, and Morris was in the course and scope of his employment at the time. She further testified that indemnity benefits were paid to Morris until December 2, 2009. The Isdecision to terminate benefits was made after a Travelers’ nurse evaluated the record of Morris’s claim. It appears that the decision was based on the surveillance tapes made by Travelers and Dr. Martin’s opinion that Morris was trying to manipulate the system.
Dr. Martin testified that he arrived at his determination of Morris’s motivation based on his observation of the surveillance; his discoveiy of the advertisement for grass cutting with Morris’s name and telephone number; and Morris’s self-limiting behavior on the FCE. On cross-examination, Dr. Martin admitted that pain and fear of re-injury were two reasons why a person might self-limit behavior during an FCE.
LAW AND ANALYSIS
Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of review. Clay v. Our Lady of Lourdes Regional Medical Center, Inc., 11-1797 (La.5/8/12); 93 So.3d 536, reh. denied, (La.6/29/12). In Richert v. Schindler Elevator Corp., 11-1099 (La.App. 5 Cir 6/28/12); 97 So.3d 487 we reiterated the well-settled rule that
... a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. However, where documents or objective evidence so contradict the witness’ story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’ story, the court of appeal may find manifest error or clear wrongness, even in a finding purportedly based upon a credibility determination. (Citations omitted).
The workers’ compensation laws Provide coverage to an emPloyee for Per‘ sonal by accident “⅜ out of and in the course of employment. LSA-R.S. 23.1031(A). An employee must prove the chain of causation required by the _J¿workers compensation statutory scheme, by establishing that the accident was work-related, that the accident caused the injury, and that the injury caused the disability. Dragon Exp. v. Chesser, 09-1041 (La.App. 5 Cir. 5/25/10); 40 So.3d 1030, 1033, writ denied, 10-1477 (La.10/1/10); 45 So.3d 1101. A workers’ compensation claimant first has the burden of establish *1180 ing that an aecident occurred on the job and that he sustained an injury, and then he must establish a causal connection between the accident and the resulting disability by a preponderance of the evidence. Id. Causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the fact finder based on all credible evidence. Id.
Appellants first contend that the workers’ compensation court erred in finding that both knee surgeries were causally related to the September 2008 accident, and the trial court erred in finding that Morris suffered two herniated discs as a result of his knee giving way prior to the second knee surgery. They further contend that the trial court erred in finding that Morris was entitled to continued and indefinite supplemental benefits as a result of his back injury.
We have reviewed the entirety of the evidence presented at trial and conclude that a rational trier of fact could have found that Morris suffered a knee injury as a result of his fall, and that the knee injury was not totally repaired by Dr. Martin’s first surgery. Morris was unwavering in relating that his knee was not completely healed after the first surgery and that he continued to have difficulty until the second surgery. He was also unwavering in his testimony that he fell and injured his back as a result of his knee “locking up.” The trial court, in its judgment, said that it found the claimant and his witnesses totally credible. We cannot say that this finding was manifestly erroneous.
|,nIn their next allegation of error, Appellants claim that the trial court erred by failing to find that Morris had violated LSA-R.S. 23:1208 by willfully making a false statement or representation for the purpose of obtaining workers’ compensation benefits and dismissing their recon-vention demand.
The Workers’ Compensation Act imposes penalties for willfully making a false representation in connection with a compensation claim. LSA-R.S. 23:1208 provides, in pertinent part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
[[Image here]]
E. Any employee violating this Section shall, upon determination by workers’ compensation judge, forfeit any right to compensation benefits under this Chapter.
LSA-R.S. 23:1208 authorizes forfeiture of benefits upon proof that: 1) there is a false statement or representation; 2) it is willfully made; and 3) it is made for the purpose of obtaining or defeating any benefit or payment. The party who requests that the benefits be forfeited must show that the employee’s statements were not only false, but they must also show that the statements or misrepresentations were willful and deliberately done with the intent to obtain benefits. Faulkner v. Better Services, Inc., 10-867 (La.App. 5 Cir. 5/24/11); 67 So.3d 646, 656-657.
Appellants present the same arguments and point to the same evidence they cited to support their allegations that the trial court erred in finding Morris was still eligible to collect benefits; namely, Dr. Martin’s opinion that Morris was malingering, the surveillance videos that showed Morris assisting at the fruit stand and riding a lawn mower, and the evidence that allegedly supported LM’s contention that Morris was operating a lawn service busi *1181 ness. However, as Indiscussed above, the trial judge could have found that Dr. Martin’s conclusions were not supported by the evidence and apparently found Morris’s statements more credible concerning the fruit stand and the lawn mowing business. We find no manifest error in the trial court’s decisions concerning this matter. Likewise, we find that the trial court did not commit manifest error in determining that Morris did not make false statements for the purpose of collecting benefits and, therefore, did not forfeit his entitlement to these benefits.
Lastly, Appellants argues that the trial court erred in assessing a penalty of $250.00 and attorney fees of $2,500.00 for its failure to timely provide Morris with the medical report of his Independent Medical Examination.
LSA-R.S. 28:1125 states:
A. Whenever an employee who is being treated by his choice of medical provider shall, at the request of the employer, the employer’s insurer, or the representative of the employer or its insurer, submit to any type of medical examination and a medical report is received by said requester, such employee or his representative shall be entitled to a copy of the written report of the results of said examination within thirty days from the date the requester receives the report.
B. Whenever an employee has accepted medical treatment by a health care provider referred by the employer, the employer’s insurer, or the representative of the employer or its insurer, he shall be entitled to receive a copy of any medical records of the medical provider that are in the possession of the employer or its insurer within thirty days from the date of the written demand upon the employer, the employer’s insurer, or the representative of the employer or its insurer.
C.Such written report or records shall be furnished to said employee or his representative at no cost to the employee. Any employer who without just cause fails to furnish such report or records to an employee so requesting same within the thirty-day period provided for above shall be liable to the employee for a civil penalty in the amount of two hundred fifty dollars, plus reasonable attorney fees for the collection of such penalty.
Appellánts allege that when the IME report of Dr. Blake was received, it was forwarded to Morris’s treating physician, and therefore they were in compliance with the statute. However, the statute provides that the report shall be forwarded to |12the employee, not his physician. In addition, Dr. Martin testified that he did not give the report to Morris, and that he informed Travelers that he did not feel comfortable discussing another physician’s report. Accordingly, we find no error in the trial court’s determination that defendant violated the provisions of LSA-R.S. 23:1125.
Appellants also allege that the penalty awarded was in excess of the statute. However, the trial court judgment awards $250.00 in penalties and $2,500.00 in attorney fees and not $2,500.00 in penalties as claimed by Appellants. We find no error in this ruling of the trial court.
In his answer, Morris alleges that the trial court erred in finding that the claims were reasonably controverted and in finding that the employer was not arbitrary and capricious in its failure to pay indemnity and medical benefits.
LSA-R.S. 23:1201 determines whether an employer should be assessed penalties and attorney fees for failure to timely pay *1182 indemnity or medical benefits. LSA-R.S. 23:1201(F)(2), however, provides that such penalties and attorney fees for failure to pay timely “shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.”
In order to reasonably controvert a claim, the employer must have some valid reason or evidence upon which to base his denial of benefits. Thus, to determine whether the claimant’s right has been reasonably controverted, thereby precluding the imposition of penalties and attorney fees under LSA-R.S. 28:1201, a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time it refused to pay all or part of the benefits allegedly owed. Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98); 721 So.2d 885, 890; Faulkner, 10-867; 67 So.3d at 658.
In this case, the trial judge failed to assess penalties and attorney fees, stating “Defendant is not found to have been ‘arbitrary or capricious’ or ‘without probably cause’ in its termination of claimant’s workers’ compensation benefits.” LM and Travelers made their determination to terminate benefits after they received an opinion from Morris’s physician that he was attempting to manipulate the system. Although the assumptions made by the treating physician were incorrect, we cannot say the trial court committed manifest error in determining that the employer was not arbitrary and capricious in its reliance.
Morris also alleges that the employer was arbitrary and capricious in failing to authorize treatment after its receipt of the results of the IME. Given that Appellants were in receipt of two conflicting medical opinions, again we cannot say that the trial court committed manifest error in its determination. We, therefore, find Morris’s answer to this appeal does not warrant any relief.
Finally, Morris seeks attorney fees for filing a frivolous appeal. We do not find that the appeal qualifies as frivolous and, therefore, we deny this request.
DECREE
For the above discussed reasons, the decision of the trial court is affirmed. Costs are assessed against Appellants, Louisiana Machinery Company, L.L.C. and Travelers Property Casualty Company of America.

AFFIRMED

. Morris signed a form indicating that Dr. Martin was his choice of physician.

. Dr. Martin’s records of Morris’s treatment do not contain a reference to Morris’s request for a second MRI.